IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**In re: CCA Recordings 2255 Litigation**,
                Petitioners,

v.                                                              Case No. 19-cv-2491-JAR-JPO

                                                                                      **(This Document Relates to Case No. 15-40059-HLT-2**, *United States v. Miguel Ramirez*, **and Case No. 19-4059-JAR-JPO**, *Miguel Ramirez v. United States*)

**United States of America.**
                Respondent.

## MEMORANDUM AND ORDER

This matter is before the Court on Petitioner Miguel Ramirez's Motion to Vacate and Discharge with Prejudice under 28 U.S.C. § 2255 (Doc. 110).[1] Petitioner alleges the government violated the Sixth Amendment by intentionally and unjustifiably intruding into his attorney-client relationship, and asks the Court to reject the government's request to dismiss this action on procedural grounds and find that he has made a sufficient showing to warrant an evidentiary hearing. As a remedy, he asks the Court to vacate his judgment with prejudice to refiling or alternatively, vacate and reduce his revocation judgment sentence by approximately 50%. The government has responded, opposing the motion and seeking dismissal on several grounds, including on threshold jurisdictional grounds.[2] The Court held that because the alleged Sixth

---

[1] Unless otherwise specified, citations prefaced with "Doc." refer to filings and docket entries in the underlying criminal case, No. 15-40059-HLT-2. Citations prefaced with "*CCA Rec. Lit.* Doc." Refer to filings and entries in this consolidated case, No. 19-cv-2491-JAR-JPO. With the exception of *United States v. Carter*, Case No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019) ("*Black* Order"), citations to filings in Case No. 16-20032-JAR are prefaced with "*Black*, Doc."

[2] *Ramirez v. United States*, No. 19-4059-JAR-JPO, Docs. 3, 5.

1

Amendment violation occurred after Petitioner entered his guilty plea but before he was sentenced, he lacked standing to challenge his conviction, but not his sentence.[3]  Since then, it has come to the Court's attention that Petitioner has completed his term of supervised release. The Court has reviewed the parties' submissions and the record and is prepared to rule.  For the reasons explained in detail below, Petitioner's challenge to his sentence, including any term of supervised release, is dismissed as moot.  Petitioner is also denied a certificate of appealability.

## I. Background

### A. Procedural History

Petitioner was charged in an Indictment with possession with the intent to distribute 500 grams or more of a mixture containing methamphetamine (Count 1); and possession with intent to distribute 50 grams or more of methamphetamine (Count 2).[4]  These Counts each carried a statutory mandatory minimum term of ten years' imprisonment and maximum term of life.[5]  On October 13, 2015, a Superseding Information was filed charging Petitioner with possession with intent to distribute less than 50 grams of a mixture or substance containing a detectable amount of methamphetamine.[6]  This Count carried no statutory minimum term.[7]

On February 3, 2016, Petitioner entered into a written binding plea agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C), and pleaded guilty to Count 1 of the Superseding Information.[8] Pursuant to this agreement, the parties jointly recommended that this Court sentence Petitioner to

---

[3] *CCA Rec. Lit.*, Docs. 730, 784.

[4] Doc. 1; *see also* 18 U.S.C. §§ 922(g) and 924(a)(2).

[5] *See* 21 U.S.C. § 841(b)(1)(A)(viii).

[6] Doc. 30.

[7] *See* 21 U.S.C. § 841(b)(1)(C).

[8] Doc. 48.

a total sentence 42 months' imprisonment on Count 1.[9]  As part of the agreement, the government agreed to: (1) dismiss the Indictment, and (2) not file additional charges arising out of the facts forming the basis for the Superseding Information.[10]  The plea agreement specifically reserved Petitioner's right to collaterally attack his conviction and sentence based on ineffective assistance of counsel and prosecutorial misconduct.[11]

Based on at total offense level of 29 and a criminal history category of II, the Presentence Investigation Report ("PSR") calculated Petitioner's applicable Guideline range at 97 to 121 months' imprisonment.[12]  The government did not file any objections to the PSR or a sentencing memorandum prior to the sentencing hearing.  On June 15, 2016, Judge Carlos Murguia adopted the PSR's sentencing calculations and determined that the applicable Guidelines range was 97 to 121 months' imprisonment.[13]  Notwithstanding this calculation, the court accepted the parties' recommendation in the plea agreement and sentenced Petitioner to 42 months' imprisonment, followed by three years of supervised release.[14]  Petitioner did not file a direct appeal, nor has he filed a prior habeas motion under 28 U.S.C. § 2255.

Petitioner was represented by Lance Sandage in the underlying criminal proceedings. The Court appointed the Federal Public Defender ("FPD") to represent Petitioner in his § 2255 proceedings on July 17, 2018.[15]  On July 17, 2019, the FPD filed a § 2255 motion on Petitioner's behalf, setting forth a single ground for relief: the government violated the Sixth Amendment by

---

[9] *Id.* ¶ 3.

[10] *Id.* ¶ 5.

[11] *Id.* ¶ 10.

[12] Doc. 56 ¶ 74.

[13] Doc. 64.

[14] Doc. 63.

[15] Standing Order 18-3.

3

intentionally and unjustifiably intruding into his attorney-client relationship. Petitioner completed his custodial term of imprisonment on April 3, 2020.[16] On February 21, 2021, Judge Holly L. Teeter revoked Petitioner's term of supervised release and sentenced him to six months' imprisonment.[17] The United States Probation Office ("USPO") has confirmed that Petitioner completed his revocation judgment sentence and has no remaining term of supervised release.

### B.     The *Black* Investigation and Order

The Court assumes the reader is familiar with its ruling in *United States v. Carter* ("*Black* Order") that precipitates the § 2255 motion before the Court.[18] That comprehensive opinion was intended to provide a record for future consideration of the many anticipated motions filed pursuant to § 2255 and is incorporated by reference herein. The Court does not restate the underlying facts and conclusions of law in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it.

Petitioner seeks relief based on events documented in the *Black* case and investigation, which involved audio recordings of telephone conversations and soundless video recordings of meetings between attorneys and their clients who were detained at CCA. The government admits that it obtained videos from CCA in connection with the *Black* case, which focused on drug and contraband trafficking inside CCA. The government's possession of these recordings came to light in August 2016, when then-Special Assistant United States Attorney ("SAUSA") Erin Tomasic and Assistant United States Attorney ("AUSA") Kim Flannigan accused defense

---

[16] Federal Bureau of Prisons, *Inmate Locator*, https://www.bop.gov/inmateloc/ (last visited Jan. 3, 2022).

[17] Doc. 147. After Judge Murguia resigned from the bench, Petitioner's criminal case was reassigned first to Judge Daniel D. Crabtree, then to Judge Holly L. Teeter. Docs. 117, 140.

[18] Case No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019). As discussed in that Order, the Sixth Amendment claims stem from recordings of conversations and meetings with counsel while they were detained at Corrections Corporation of America ("CCA"). That facility has since been renamed CoreCivic. For convenience, the Court refers to it as CCA in this Order.

4

attorney Jacquelyn Rokusek of "jeopardiz[ing] their investigation" in *Black* based on information they claimed to have gleaned from the video recordings.[19] The defense also discovered that the United States Attorney's Office for the District of Kansas ("USAO") had a practice of routinely obtaining CCA recorded attorney-client phone calls from CCA, and that it did so without notice to attorneys, clients, or courts.[20]

Once notified of the video and audio recordings, this Court ordered (1) all local federal detention facilities to cease recording attorney-client meetings and phone calls;[21] (2) the video and audio recordings in USAO custody to be impounded;[22] and (3) the government to preserve its computer hard drives.[23] By October 11, 2016, the Court had appointed a Special Master to assist in what the Court termed "Phase I and Phase II" of the Court's investigation, that is, to determine the number of recordings possessed by the government, to index and segregate them, and to identify privileged or confidential information within those recordings.[24]

On January 31, 2017, the Special Master issued the "First Report Regarding Video Recordings."[25] The Special Master determined that the government had obtained from CCA video recordings of the attorney-meeting rooms made between February 20, 2016, and May 16, 2016—a period of 86 days, or approximately 14,000 hours—documenting approximately 700

---

[19] *Id.* at 70–80.

[20] *Id.* at 29–30.

[21] *Black*, Doc. 253 at 3.

[22] *Id.* at 3, 12 ("The Court subsequently issued a clawback order directing the government to gather and surrender to the Court all audio recordings in its possession, in the possession of investigative agencies, and in the possession of other defendants who had received them in discovery.").

[23] *Id.* at 40. At the September 7, 2016 hearing in *Black*, "[t]he Court ordered the government to retain and preserve all of the hard drives as well as all of the hardware necessary to access the information on the hard drives." *Id.*

[24] *Black*, Doc. 146 (Appointment Order).

[25] *Black*, Doc. 193.

attorney visits.[26]  This Court in *Black* found that the USAO did not come into possession of the CCA videos until June 1, 2016.[27]  The Court has since clarified that the government's possession of the video recordings began when the United States Secret Service picked up DVR 6 from CCA on May 17, 2016.[28]  There is no dispute that the USAO disgorged the video recordings to the Court on August 9, 2016.  Nor is there evidence that the government maintained copies of the video recordings on a computer (the "AVPC") or on Special Agent Jeff Stokes's laptop after that time.[29]

The government did not cooperate with the Special Master's investigation, however, which ultimately resulted in a lengthy delay in this Court's ability to rule on these issues.  Finally, despite the delay associated with the government's failure to cooperate and its litigation efforts challenging the propriety of the Special Master's investigation, the Court conducted a full evidentiary hearing on all pending matters in *Black* in October and November 2018.

On August 13, 2019, the Court issued the *Black* Order, which detailed, among other things, the government's view that soundless video recordings are not protected communications and rejected the government's argument that the communication in the videos is too rudimentary to discern whether it involves legal advice or strategy or to disclose the content of any accompanying verbal communication.[30]  The Order also addressed the governing standard for an intentional-intrusion Sixth Amendment claim in the Tenth Circuit.[31]  The Order discussed the

---

[26] *Id.* at 3, 5 (specifically, CCA Attorney Meeting Rooms 3 and 6 through 9).

[27] *Black* Order at 66.

[28] *CCA Rec. Lit.*, Doc. 784 at 13.

[29] *CCA Rec. Lit.*, Doc. 546 (Petitioners' Notice of Errata withdrawing any such allegations individually or collectively advanced).

[30] *Black* Order at 164–65.

[31] *Id.* at 145–62.

elements required to prove a per se violation of the Sixth Amendment under the Tenth Circuit's decision in *Shillinger v. Haworth*,[32] which held that a per se Sixth Amendment violation occurs when: (1) there is a protected attorney-client communication; (2) the government purposefully intruded into the attorney-client relationship; (3) the government becomes "privy to" the attorney-client communication because of its intrusion; and (4) the intrusion was not justified by any legitimate law enforcement interest.[33] Once those elements are established, prejudice is presumed.[34]

The Court further held that a finding of purposeful intrusion into the attorney-client relationship necessarily requires a threshold showing that the recordings were protected attorney-client communications.[35] While recognizing that the attorney-client privilege is not a right guaranteed by the Sixth Amendment, the Court applied principles relating to the privilege as a framework for this showing that the recordings between petitioners and counsel were protected communications under the Sixth Amendment. With respect to the video recordings, the Court determined that the following threshold showings must be made after review and verification by the FPD in each individual case: (1) the video of the attorney-client meeting exists; and (2) the quality of the non-verbal communication in the video is sufficient to confirm communication between the detainee and counsel.[36] This threshold showing requires an affidavit from defense counsel confirming that the nature and purpose of the meeting(s) were within the ambit of

---

[32] 70 F.3d 1132 (10th Cir. 1995).

[33] *Black* Order at 162 (citing *Shillinger*, 70 F.3d at 1142).

[34] *Id.*

[35] *Id.* at 163.

[36] *Id.* at 166.

protected communication, including but not limited to defense preparation, plea negotiations, or review of discovery.[37]

### C.    Proceedings in Consolidated Master Case

The *Black* Order reassigned all *Black*-related § 2255 motions pending before other judges in the District to the undersigned for determination of the merits of petitioners' Sixth Amendment claims and for consolidated discovery.[38] It was this Court's intent that by reassigning the habeas actions to the undersigned and consolidating the cases for discovery, the process for seeing over 100 cases to completion would be streamlined for all parties.

Like the *Black* Order, the Court assumes the reader is familiar with the proceedings in the consolidated master case that precipitates the matter before the Court, and does not restate the underlying facts in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it.  In addition to the two threshold showings recited above, this Court stated during a September 2019 status conference that the privilege logs for video recordings would need to describe the specific topic of any confidential attorney-client communication, for example, plea negotiations, as well as an indication that "some nonverbal communication going on about that [topic] that . . . is observable."[39]  The government raised blanket objections to the privilege logs, arguing that many fail to meet the threshold showings because (1) they do not describe the topic of any communication or describe the communicative value of any observable nonverbal gestures; (2) boilerplate statements that a video reveals attorney communications or that communication was about legal advice and strategy are too vague; and (3) physical gestures such as pointing to documents or a laptop alone are not

---

[37] *Id.*

[38] *CCA Rec. Lit.*, Doc. 1.

[39] *CCA Rec. Lit.*, Doc. 21 at 50.

sufficient to establish privileged attorney-client communications are depicted on a soundless video.

As detailed in the Court's October 15, 2020 Orders, the parties' initial efforts at cooperation culminated in the government's notice that it refuses to comply with discovery orders and demands that the Court rule immediately on both the procedural and merits defenses raised in its responses to the § 2255 motions.[40] Highly summarized, the Court: (1) reaffirmed its previous ruling on the government's implied waiver argument and, in light of the government's blanket objections to petitioners' privilege logs, established a procedure for *in camera* review of the recordings; (2) reaffirmed the finding that soundless video recordings may be protected communications and found that petitioners did not waive any protection because the attorney meeting rooms were monitored; (3) ordered the parties to supplement their responses and replies to address jurisdictional defenses and the collateral-attack waiver by plea agreement issue; and (4) found the government's refusal to comply with discovery orders issued by the Court sanctionable under Fed. R. Civ. P. 37(b)(2) and notified the government of its intent to take as conclusively established certain facts petitioners might have proved regarding the "privy to" element of their Sixth Amendment claims for any petitioner who establishes that he or she is entitled to an evidentiary hearing.[41]

On January 18, 2021, the Court issued an order: (1) reaffirming and expanding its holding regarding the applicable Sixth Amendment standard; (2) addressing the collateral-waiver by plea issue; and (3) addressing jurisdictional defenses raised by the government, including certification

---

[40] *CCA Rec. Lit.*, Docs. 587, 588.

[41] *Id.* The Court subsequently denied petitioners' related Motion for Spoliation Sanctions under Fed. R. Civ. P. 37(e)(2) alleging that the government destroyed or lost ESI relative to the video recordings. *CCA Rec. Lit.*, Doc. 926.

9

requirements under Rule 2(b) of the Rules Governing Section 2255 Proceedings.[42] Specifically, the Court ruled that three petitioners in this consolidated litigation who proceeded to trial in their underlying criminal proceedings are entitled to evidentiary hearings on their audio recording Sixth Amendment claims.  Second, the Court determined that the rule in *Tollett v. Henderson* procedurally barred petitioners who alleged pre-plea Sixth Amendment violations from advancing those claims.[43]  The Court dismissed one petitioner's § 2255 motion on these grounds and certified the issue for appeal; thirty-nine petitioners have successfully moved the Court to stay dismissal of their claims pending the appeal of that case.[44]  Third, the Court determined that approximately twenty petitioners lacked standing to advance their Sixth Amendment claims for various reasons, including: claims that alleged post-sentencing violations; claims where petitioners who had been deported challenged only their sentence; claims where petitioners challenging their sentence had been sentenced to the mandatory-minimum sentence; and claims involving binding pleas that were accepted by the court at the change-of-plea-hearing.[45]

Petitioner timely filed his Rule 2(b) certification on March 29, 2021.[46]

On December 10, 2021, the Court issued an order that concluded petitioners in the temporal category of claims who alleged Sixth Amendment violations that occurred post-plea or conviction but before sentencing could not rely on *Shillinger*'s per se rule.[47]

D.  **Recordings in this Case**

On August 13, 2019, this Court released the video recordings to the FPD as a result of

---

[42] *CCA Rec. Lit.*, Doc. 730 (clarified and reconsidered in part on other grounds, *id.*, Doc. 784).

[43] *Id.*  (citing 411 U.S. 258 (1973)).

[44] *CCA Rec. Lit.*, Docs. 874, 922.

[45] *CCA Rec. Lit.*, Docs. 730, 784.

[46] *CCA Rec. Lit.*, Doc. 812-1.

[47] *CCA Rec. Lit.*, Doc. 1034.

the *Black* investigation.[48]  The FPD, along with defense counsel, reviewed one video recording of Petitioner meeting with Sandage in person at CCA on May 3, 2016.[49]

Pursuant to the Court's Order, Petitioner provided a privilege log detailing the claimed protected communication, verifying that during this meeting, Petitioner discussed matters "relat[ing] to legal advice or strategy" with Sandage.[50]  Petitioner also provided a sworn declaration from Sandage, stating that he reviewed the video recording listed on the privilege log and confirmed, with respect to the recorded meeting and each other meeting with Petitioner at CCA: (1) the only reason he met with Petitioner "was to discuss matters related to legal advice or strategy"; and (2) he had no knowledge nor did he believe that the meetings were recorded as they were attorney-client protected, that he did not consent to such, and that he was not aware such recordings would be dispensed to prosecutors.[51]

Petitioner was prosecuted by AUSAs Greg Hough and Duston Slinkard, who deny that they viewed the recording during the pending underlying case.[52]

The Court reviewed the video recording *in camera*. As set out in the privilege log, the Court confirms that the video recording shows Petitioner meeting with Sandage for approximately forty-five minutes.  In light of the analysis below, however, the details of the meeting visible in the video are not pertinent and will not be discussed in this order.

---

[48] *Black* Order at 165.

[49] *CCA Rec. Lit.*, Doc. 205-2 at 161.

[50] *Id.*

[51] *Ramirez*, 19-4059-JAR-JPO, Doc. 4-1.

[52] *Id.* Doc. 3-1, 3-2.

**II.     Discussion**

Petitioner's claim is in the temporal category of motions alleging post-plea/pre-sentencing Sixth Amendment violations. Petitioner falls in a sub-category of these claims involving a Rule 11(c)(1)(C) binding plea agreement for a specific term. The recorded meeting between Petitioner and Standridge took place on May 3, 2016, after he entered a binding unconditional guilty plea on February 3, 2016, and before he was sentenced on June 15, 2016. As noted above, the USAO did not have possession of and access to the video recordings until May 17, 2016, and it gave up possession when it disgorged the videos to the Court on August 9, 2016. Thus, any alleged Sixth Amendment violation could not have occurred until after Petitioner's plea but before he was sentenced.

As this Court discussed in its January 18, 2021 Order, when the alleged intrusion occurs after the petitioner entered a guilty plea, it eliminates the possibility that the intrusion could have tainted the petitioner's conviction.[53] Thus, Petitioner does not have standing to challenge his guilty plea under § 2255.[54] The only tainted proceeding could be sentencing. Having determined that this category of governmental-intrusion claims may not rely on the *Shillinger* presumption of prejudice, the issue before the Court is whether Petitioner has demonstrated a realistic possibility of injury or benefit to the government.

Before reaching the merits of Petitioner's claim, this Court must be satisfied that it has jurisdiction to consider his § 2255 motion. "Where judicial relief will not remedy the [party's] injury, 'the [party] can no longer satisfy the Article III case or controversy jurisdictional

---

[53] Doc. 730 at 54.

[54] *Id.*

requirement and the appeal is moot.'"[55] In the Tenth Circuit, "under ordinary circumstances, a defendant who has served his term of imprisonment but is still serving a term of supervised release may challenge his sentence if his unexpired term of supervised release could be reduced or eliminated by a favorable appellate ruling."[56] Under these circumstances, a petitioner satisfies the Article III case-or-controversy requirement because his liberty is affected by ongoing conditions and restrictions of supervised release.[57] In Petitioner's case, however, he completed his custodial sentence, revocation judgment sentence, and three-year term of supervised release while his § 2255 motion was pending. He no longer has any obligation to report to a probation officer and is not under the supervision of the USPO. Thus, this Court cannot provide him with any relief with respect to his completed sentence or term of supervised release. Petitioner's completion of his custodial and revocation sentence and term of supervised release has rendered his challenge to his sentence moot and deprives this Court of jurisdiction for further consideration.[58] Petitioner's § 2255 motion is dismissed.[59]

## III.   Certificate of Appealability

Rule 11 of the Rules Governing Section 2255 Proceedings states that the Court must issue or deny a certificate of appealability ["COA"] when it enters a final order adverse to the applicant. "A certificate of appealability may issue . . . only if the applicant has made a

---

[55] *United States v. Vera-Flores*, 496 F.3d 1177, 1180 (10th Cir. 2007) (quoting *United States v. Meyers*, 200 F.3d 715, 718 (10th Cir. 2000)).

[56] *Id.* (citation omitted).

[57] *Id.*

[58] *See Spencer v. Kemna*, 523 U.S. 1, 18 (1998) (explaining a § 2255 motion becomes moot upon prisoner's release from custody unless motion demonstrates adverse collateral consequences from challenged sentence or conviction).

[59] Because this lack of jurisdiction provides a sufficient basis to dismiss Petitioner's § 2255 motion, the Court does not address the government's other arguments regarding timeliness under § 2255(f)(4).

substantial showing of the denial of a constitutional right."[60]  If the district court denies a habeas petition on procedural grounds without reaching the merits of petitioner's underlying constitutional claim, "the prisoner must show both (1) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling' *and* (2) 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right.'"[61]  For the reasons explained above, Petitioner has not met either showing and the Court therefore denies a COA.

**IT IS THEREFORE ORDERED BY THE COURT** that Petitioner Miguel Ramirez's Motion to Vacate and Discharge with Prejudice under 28 U.S.C. 2255 (Doc. 110) is **dismissed**. Petitioner is also denied a certificate of appealability.

**IT IS SO ORDERED.**

Dated: January 4, 2022

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[60] 28 U.S.C. § 2253(c)(2).

[61] *United States v. Park*, 727 F. App'x 526, 528 (10th Cir. 2018) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).